UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| POET, LLC and POET RESEARCH, INC., | CIV 17-4029 |
| Plaintiffs, | |
| vs. | MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS COUNTS I, II AND III OF THE AMENDED COUNTERCLAIM |
| NELSON ENGINEERING, INC. and JERRY BAKER, | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs filed a four-count complaint against Defendants alleging misappropriation of trade secrets under federal law, misappropriation of trade secrets under state law, breach of confidentiality agreement by defendant Jerry Baker, and tortious interference with contract by defendant Nelson Engineering, Inc. (Doc. 1.) Defendants filed an amended counterclaim against Plaintiffs for defamation, tortious interference with business relationships, tortious interference with contractual rights and declaratory relief. (Doc. 21.)

Plaintiffs moved to dismiss three counts of Defendants' amended counterclaim for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 27.) The motion has been fully briefed. For the following reasons, Plaintiffs' motion to dismiss will be denied.

## BACKGROUND

The facts will be stated in the light most favorable to Defendants, the non-moving parties. Plaintiffs, POET, LLC and POET Research, Inc. (POET), are involved with ethanol production. Defendant Nelson Engineering, Inc. (Nelson) is involved in certain aspects of the ethanol industry as a consulting engineering company. From 2004 to 2008, defendant Jerry Baker (Baker) was employed by POET Plant Management, f/k/a Broin Companies. Baker signed a non-disclosure, or confidentiality, agreement with POET Plant Management.

While Baker was working as an engineering manager for POET, POET began using technology called "Delayed Dilution Technology" (DD) in its ethanol plants.

POET claims that its DD technology is a confidential trade secret.

Baker left POET and, after complying with his two-year non-competition agreement with POET, he went to work for Nelson in 2010. Baker and Nelson developed a technology called "Hydrolysis Utilization" ("HU"). POET asserts that HU technology is exactly like DD technology.

Defendants assert that their HU technology is a confidential trade secret. Defendants disclosed the details of HU to Glacial Lakes Energy pursuant to a confidentiality and non-disclosure agreement (NDA) with Glacial Lakes. A former Glacial Lakes employee now works at a POET-affiliated ethanol plant. POET claims that the former Glacial Lakes employee told POET that Defendants' HU technology is the same as POET's DD technology. In count III of their amended counterclaim, Defendants allege that POET interfered with their rights under the Glacial Lakes confidentiality agreement by extracting information from the former Glacial Lakes employee about Defendants' protected HU technology. Doc. 21 ¶ 30.

The day after POET filed this lawsuit against Defendants for misappropriation of trade secrets, POET published the following statement on its website:

> POET yesterday filed a lawsuit in US District Court of Sioux Falls, S.D. alleging that the Sioux Falls-based company Nelson Engineering has misappropriated POET's trade secrets. The lawsuit is captioned "POET, LLC and POET Research, Inc. v. Nelson Engineering and Jerry Baker," Case No. CIV 17-4029.
> The trade secret in question is known at POET as "Delayed Dilution," a technology that allows POET to achieve increased ethanol production from each fermenter in the process.
> "POET has invested significant time and money into developing proprietary technology and processes that contribute to our long-standing success as an industry

leader," said POET President and COO Jeff Lautt. "We will do whatever necessary to protect our intellectual property from unauthorized use by others."

Doc. 21 ¶ 3. Count I of Defendants' amended counterclaim is a defamation claim based on POET's website statement:

> 4. Separate and apart from merely stating the fact that a lawsuit has been filed, the above website statement, in particular the quotation from Mr. Lautt in the context of the preceding two paragraphs, states or implies that Defendants misappropriated or used without authorization POET's trade secrets, which statement or implication is untrue and damaging to Defendants' business reputation.
>
> 5. The above-quoted comments of POET's President and Chief Operating Officer, Jeff Lautt, state or imply that Defendants stole, misappropriated, or used without authorization POET's proprietary technology, proprietary processes, or intellectual property, which comments and implication are untrue and injurious to Defendants' business or occupation.
>
> 6. Defendants' Hydrolysis Utilization technology ("HU") was developed wholly independently of POET's trade secrets or DD, and Defendants did not misappropriate or use POET's trade secrets or DD.
>
> 7. POET knows that DD technology is not novel, confidential, proprietary, or a trade secret, and POET knows Defendants did not misappropriate or use without authorization POET's trade secrets or DD, yet POET published the above website comments concerning Defendants for improper purposes, with malice, and in bad faith.
>
> 8. POET's website statements have damaged Defendants, Defendants' business reputations, and Defendants' relationships with customers and others in the ethanol industry.

Doc. 21 ¶¶ 4-8.

In count II of their amended counterclaim, Defendants assert that POET intentionally interfered with Defendants' business relationships through the website statement "stating or implying that Defendants stole, misappropriated, or used without authorization POET's proprietary technology, proprietary processes, or intellectual property, which comments are untrue and injurious to Defendants' business or occupation." Doc. 21 ¶ 23.

3

Defendants seek damages on their counterclaims for defamation, tortious interference with business relationships and tortious interference with contract in an amount to be proven at trial. POET argues that the claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

**DISCUSSION**

Standard of Review

A party may move under Rule 12(b)(6) to dismiss a complaint for "fail[ing] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test "the sufficiency of a complaint [.]" *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff[,]" *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and accept as true all of the well-pleaded allegations contained in the complaint. *M.M. Silta*, 616 F.3d at 876.

A. Defamation (Count I)

The parties agree that South Dakota law governs the defamation claim. To state a claim for defamation under South Dakota law, a plaintiff must establish, among other things, "false and unprivileged publication(s)." SDCL § 20-11-2 through 4.

1. Truth as a Defense

POET first argues that Defendants' defamation counterclaim should be dismissed under Rule 12(b)(6) because the statements on POET's website are true, not false or defamatory.[1] Defendants counter that, even if each statement in POET's press release is true, the statement as a whole implies a false assertion of objective fact, *i.e.*, that Defendants misappropriated POET's trade secrets and improperly capitalized on POET's intellectual property without authorization.

"A statement is actionable if it implies a false assertion of objective fact." *Paint Brush Corp., Parts Brush Div. v. Neu*, 599 N.W.2d 384, 397 (S.D. 1999). "'[E]xpressions of opinion may often imply assertions of objective fact,' and those statements are actionable." *Id.* at 396 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). The Court must decide whether POET's statement is capable of defamatory meaning by implying a false assertion of objective fact. *Id.* at 397. The statement's explicit reference in the first paragraph to the lawsuit against "Nelson Engineering and Jerry Baker" alleging that they "misappropriated POET's trade secrets," followed by a paragraph describing the "trade secret in question," and then a third and final paragraph indicating that POET will do whatever is necessary to protect its intellectual property "from unauthorized use by others" implies that Defendants misappropriated and used POET's trade secrets without authorization. Whether Defendants stole POET's trade secrets is an objective fact that can be proven true or false. Defendants sufficiently allege a false assertion of objective fact to survive dismissal of their defamation claim under Rule 12(b)(6).

2. Absolute Litigation Privilege

POET next argues that the defamation claim should be barred by the absolute litigation privilege. A communication made in "any legislative or judicial proceeding, or in any other official proceeding authorized by law" is absolutely privileged and may not form the basis of a defamation claim. SDCL § 20-11-5(2); *Janklow v. Keller*, 241 N.W.2d 364, 367 (S.D. 1976). The purpose of

---

[1] South Dakota's Bill of Rights provides, in part, that "in all trials for libel, both civil and criminal, truth, when published with good motives and for justifiable ends, shall be a sufficient defense." S.D. Const. art. 6, § 5. This does not take from the courts the duty to determine whether a communication is capable of a defamatory meaning. *Brodsky v. Journal Pub. Co.*, 42 N.W.2d 855 (S.D. 1950).

the litigation privilege is to protect access to the courts by allowing litigants "to secure and defend their rights without fear of being harassed by actions for defamation . . . [a]nd to promote the unfettered administration of justice." *Janklow*, 241 N.W.2d at 368. The litigation privilege applies to a publication only if it "(1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law." *Id.* An absolute privilege provides a complete bar to a claim for defamation, regardless of the defendant's motive. *Sparagon v. Native Am. Publishers, Inc.*, 542 N.W.2d 125, 132 (1996). The existence of privilege is a question of law for the court. *Id.*

Defendants argue that the absolute litigation privilege does not extend to statements like POET's that a party disseminates on a website to the general public regarding its own pending litigation.

The parties agree that the South Dakota Supreme Court has not addressed the absolute litigation privilege in analogous circumstances. When faced with an undecided issue of state law, the task of a federal court sitting in diversity is to attempt to predict how the state's highest court would resolve the question. *See Polk v. Ford Motor Co.*, 529 F.2d 259, 264 (8th Cir. 1976). To accomplish this task, federal courts are to consider "any persuasive data that is available, such as compelling inferences or logical implications from other related adjudications and considered pronouncements." *Id.* at 264.

The absolute privilege generally does not extend to out-of-court communications with third parties. *See, e.g., Thompson v. Frank*, 730 N.E.2d 143, 146 (Ill. App. Ct. 2000) (finding that absolute privilege did not extend to allegedly defamatory communication between one party's attorney and the spouse of the opposing party to pending litigation); *Kurczaba v. Pollock*, 742 N.E.2d 425, 439-441 (Ill. App. Ct. 2000) (holding that the absolute privilege did not apply to defendant's out-of-court dissemination of a complaint to third parties not involved in the action). Some courts have recognized exceptions to this general rule in certain circumstances, such as in the two California cases cited by POET where the courts found that the non-parties had a substantial interest in the

proceeding. *See eCash Technologies, Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1145, 1152 (C.D. Cal. 2001) (extending litigation privilege to a letter from the plaintiff's lawyer informing auction company's legal department that plaintiff owns the registered trademark for "ECASH" and that the domain name "ecash.com" listed for sale by defendant on the auction company's website was the subject of a pending lawsuit filed by plaintiff against defendant under cyberpiracy and trademark statutes, and enclosing a copy of the complaint); *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1041 (S.D. Cal. 2011) (extending privilege to plaintiff's press release about patent infringement lawsuit disseminated to "non-parties with a substantial interest in the outcome" of the litigation). There is no showing in the present case that the recipients of POET's internet statement had a substantial interest in the lawsuit against Defendants that would call for extending the absolute litigation privilege to POET's internet statement.

In more factually analogous cases, courts generally have rejected arguments that the absolute privilege should extend to providing pleadings or publicizing them to the press or on the internet, finding that the recipients lack the proper connection to the underlying judicial proceedings and do not have the required interest in the litigation.

For example, in *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692 (8th Cir. 1979), the Eighth Circuit declined to extend the litigation privilege to statements made to the media about a previously filed complaint. *Id.* at 699. The Court stated, "In determining whether an occasion is absolutely privileged, the pivotal factor is frequently to whom the matter is published. Publication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion." *Id.* at 697. The Eighth Circuit also found that the public policy underlying the purpose of the absolute litigation privilege is not furthered by protecting statements made to the press:

> [a]llowing defamation suits for communications to the news media will not generally inhibit parties or their attorneys from fully investigating their claims or completely detailing them for the court or other parties. Also, the important factor of judicial control is absent. The salutary policy of allowing freedom of communication in judicial proceedings does not warrant or countenance the dissemination and distribution of defamatory accusations outside of the judicial proceeding. No public

7

> purpose is served by allowing a person to unqualifiedly make libelous or defamatory statements about another.... The scope of the privilege is restricted to communications such as those made between an attorney and client, or in the examination of witnesses by counsel, or in statements made by counsel to the court or jury. Thus, while a defamatory pleading is privileged, that pleading cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected with the judicial proceeding. Otherwise, to cause great harm and mischief a person need only file false and defamatory statements as judicial pleadings and then proceed to republish the defamation at will under the cloak of immunity.

*Asay*, 594 F.2d at 698 (internal quotation marks and citations omitted). Similarly, in *Jacobs v. Adelson*, 325 P.3d 1282 (Nev. 2014), the Nevada Supreme Court followed "the majority of states" that have determined the absolute privilege does not apply when communications about ongoing litigation are made to newspapers and during press conferences when the media holds no more significant interest legal relationship to the litigation than the general public. *See also Pratt v. Nelson*, 164 P.3d 366, 380 (Utah 2007) (holding "that the press generally lack a connection to judicial proceedings sufficient to warrant an extension of the judicial privilege to statements made by parties to the press").

At least one court has held that communications made via the internet to publicize a lawsuit are "even more removed from the proceeding" than publication to the press "because the audience chosen was wholly unconnected to the judicial process." *Seidl v. Greentree Mortg. Co.*, 30 F.Supp.2d 1292, 1315 (D. Colo. 1998). The *Seidl* court declined to extend the absolute litigation privilege to statements posted on the internet by the plaintiff and his attorney about the lawsuit they filed against the defendant. *See id.*

Again, there is no showing that the recipients of POET's internet statement have a connection to POET's lawsuit against Defendants. Furthermore, the statement was not sufficiently connected with a judicial proceeding. Under these circumstances, the Court predicts that the South Dakota Supreme Court would not extend the absolute litigation privilege to the statement about Defendants that POET posted to the public on the internet. Thus, Defendants' defamation claim will not be dismissed based on the litigation privilege.

3. Qualified Fair Report Privilege

POET also argues that Defendants' defamation claim is barred by the fair report privilege. Under South Dakota law, the fair report privilege is qualified rather than absolute because it can be waived by a showing of malice.[2] This common law privilege has been codified at SDCL § 20-11-5(4) ("A privileged communication is one made ... (4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof."). The South Dakota Supreme Court has described the privilege:

> The common law privilege of fair report protects the publishers of false and defamatory matter in an account of a public official proceedings of a court, legislature, administrative body when the report is a fair and accurate account of the proceedings, the report is made in good faith and without malice (in the sense that it was made without intent to harm or with reckless disregard for the rights of another), and the report purports to be an account of official activity. *See* K. Sowle, Defamation and the First Amendment: the Case for a Constitutional Privilege of Fair Report. 54 NYU L.REV. 471-4.

*Janklow v. Viking Press*, 378 N.W.2d 875, 879 (S.D. 1985).

The Fourth Circuit has explained that, at its core, the "fair report privilege" is but "an exception to the republication rule," under which "one who repeats a defamatory statement is as liable as the original defamer." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) (citation omitted). Thus, "pursuant to a special privilege, republications of reports of judicial proceedings are not subject to liability unless the privilege is abused," that is, the news media may "avoid liability" if the report is properly attributed to the original source and "the republication is accurate and complete or a fair abridgement of the official report." *Rushford v. New Yorker Magazine*, 846 F.2d 249, 254 (4th Cir. 1988) (citations omitted). The privilege is uniquely tailored to foster the free exchange of information in the media about every aspect of the administration of justice. *See, e.g., Salzano v. North Jersey Media Group Inc.*, 993 A.2d 778, 782, 790-91, 798 (N.J. 2000) (extending fair report privilege to non-party publisher of articles reporting allegations found in a bankruptcy court complaint accusing plaintiff of stealing money from his company).

---

[2] "The difference between a qualified and an absolute privilege is that malice destroys the qualified privilege but does not affect the latter." *Waln v. Putnam*, 196 N.W.2d 579, 583-4 (1972).

9

The South Dakota Supreme Court has not addressed whether the fair report privilege extends to a party's republication on the internet of defamatory allegations in a complaint filed by that same party. POET cites two unpublished trial court opinions from other jurisdictions applying the fair report privilege to press releases restating allegations made in litigants' complaints, and argues that the privilege applies here. Defendants argue both that South Dakota would not extend the privilege to protect self-reported allegations and that, even if the privilege applies, it is waived by POET's malice.

Similar arguments were made by the parties in *Kurczaba v. Pollock*, 742 N.E.2d 425 (Ill. App. Ct. 2000). The issue was whether the fair report privilege applied to an attorney's dissemination of an amended civil complaint he authored and mailed to members of the Polish community in Chicago. In holding that the privilege did not apply, the Illinois Court of Appeals explained:

> First, defendant seeks to confer the privilege upon himself. "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not." Restatement (Second) of Torts, § 611, comment c, at 299 (1977). *See also* 50 Am.Jur.2d Libel & Slander § 318, at 626-27 (1995). In the instant case, defendant made the original defamatory publication (the *Malus* complaint) and then "reported" the same matter to others. Based on this alone, the fair report of judicial proceedings privilege is not available to defendant.

*Kurczaba*, 742 N.E.2d at 443.[3] The reasoning in *Kurczaba*, and other published cases, persuades this Court that the South Dakota Supreme Court would not extend the fair report privilege to a party's self-report of the allegations made in their own complaint. *See, e.g., Milford Power Ltd. P'ship by Milford Power Assocs. Inc. v. New England Power Co.*, 918 F. Supp. 471, 485 (D. Mass. 1996) ("While Massachusetts caselaw makes clear that the news media are privileged to make fair and

---

[3]The *Kurczaba* court also found that the privilege did not apply because, along with the complaint, the defendant included an advertisement for the plaintiff's law firm (the firm which defendant accused in the amended complaint of the unauthorized practice of law), information that was "not solely contained in the public records or proceedings" and which "was clearly meant to convey something." *Id.* at 443. Furthermore, the defendant was not granted leave of court to pursue all claims in the amended complaint that he mailed, so the publicly disseminated document was not fair and accurate. *See id.*

10

accurate reports about judicial proceedings, this Court is not persuaded that the 'fair report' privilege protects the dissemination to the news media of a news release by a party"); *Fuente Cigar, Ltd. v. Opus One*, 985 F. Supp. 1448, 1457 (M.D. Fla. 1997) (finding no qualified privilege and allowing plaintiff to bring defamation claim based on statements by defendant to trade publication that plaintiff engaged in unlawful business conduct, made "at the very onset of litigation and upon [defendant's] own initiative"); *Bridge C.A.T. Scan Assoc. v. Ohio–Nuclear*, 608 F.Supp. 1187, 1194 (S.D.N.Y. 1985) ("Once filed, the complaint is a public document with access to it available to the public and the news media. But for the plaintiff, purposely and maliciously, to stimulate press coverage and wide publicity of a complaint with its allegedly false and malicious statements is beyond the pale of protection [under the fair report privilege].") The immunity from a defamation suit was meant to extend not to the party who made the statements in the complaint in the first place, but rather to publishers who fully and fairly report the contents of the complaint.

Furthermore, even if the fair report privilege is available, Defendants have alleged facts in the counterclaim sufficient to demonstrate that POET waived the privilege by publishing the website comments with malice. *See* Doc. 21 ¶ 7 (POET published the website statement "for improper purposes, with malice, and in bad faith," knowing that Defendants "did not misappropriate or use without authorization POET's trade secrets"). For purposes of this Rule 12(b)(6) motion to dismiss, the Court takes as true Defendants' allegation that POET maliciously publicized on the internet false and defamatory charges that POET knew were not true.[4] This case is in its early stages. Whether those allegations will be established after discovery is a separate question.

In summary, POET's allegedly defamatory statement is not protected by either the absolute litigation privilege or the qualified fair report privilege and Defendants' defamation claim will not be dismissed.

---

[4]POET argues in its reply brief that Defendants' malice allegations are "a veiled attempt to assert a premature malicious prosecution claim" without meeting the requirement of an outcome favorable to them. (Doc. 32 at 7-8.) It is also possible that the malice allegations are asserted, in part, to avoid dismissal of the defamation claim in the event POET asserted the fair report privilege.

B. Tortious Interference with Business Relationships (Count II)

The elements for this cause of action are 1) the existence of a valid business relationship or expectancy, 2) knowledge by the interferer of the relationship or expectancy, 3) an intentional and unjustified act of interference on the part of the interferer, 4) proof that the interference caused the harm sustained, and 5) damage to the party whose relationship or expectancy was disrupted. *Hayes v. Northern Hills Gen. Hosp.*, 590 N.W.2d 243, 248 (S.D. 1999).

POET argues that Defendants failed to allege any facts showing that POET intended to interfere with Defendants' business relationships. (Doc. 32 at 11.)

Defendants allege that POET's publication on the internet that Defendants, who are consulting engineers in the ethanol industry, misappropriated POET's trade secrets, when POET knew that was not true, has harmed Defendants' ability to attract potential customers. Defendants have adequately pled their claim for tortious interference with business relationships under Rule 12(b)(6), and Count II of the amended counterclaim will not be dismissed.

C. Tortious Interference with Contract (Count III)

The essential elements of a claim of tortious interference with contract consist of: (1) the existence of a valid contractual relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the relationship, and (6) damages. *Gruhlke v. Sioux Empire Federal Credit Union, Inc.*, 756 N.W.2d 399, 406 (S.D. 2008).

Defendants have stated a claim of tortious interference with contract. First, Defendants allege that it has a valid contract with Glacial Lakes. Amended Counterclaim ¶ 28. Second, Defendants allege that POET knew about this agreement. *Id.* ¶ 29. Third, Defendants allege that POET intentionally and unjustifiably extracted information that was protected by the contract from a former Glacial Lakes employee who now works at POET, in violation of Defendants' rights under the

agreement with Glacial Lakes. *Id.* ¶ 30. Finally, Defendants allege that this act of interference caused damages. *Id.* ¶ 31. The counterclaim is not lacking in sufficient detail and provides POET with notice of what Defendants intend to prove as to the elements of this tortious interference claim.

POET asserts that Defendants have failed to sufficiently allege any damages or harm suffered as a result of POET's alleged tortious interference with the Glacial Lakes confidentiality and non-disclosure agreements, as required by the last element of a tortious interference with contract claim. Defendants claim that they have not yet determined the amount of damages they are owed as a result of the disclosure, and that they have a right to conduct discovery to determine that amount. There is no requirement that the measure of damages alleged to have been sustained be stated in the complaint. It is reasonable to infer that Defendants would be harmed if its confidential trade secrets were exposed in violation of a non-disclosure agreement meant to protect the secrets.

For these reasons, POET's motion to dismiss the tortious interference with contract claim in Count III of Defendants' counterclaim will be denied. Accordingly,

IT IS ORDERED that Plaintiffs' Motion to Dismiss Counts I, II and III of Defendants' Amended Counterclaim, Doc. 27, is denied.

Dated this 7th day of February, 2018.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK
BY: _____
       DEPUTY